UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>NORMAN V. MEIER,<br><br><br>Defendant,<br><br>and<br><br>TREUHAND, INC., NORMAN MEIER INTERNATIONAL, INC. a/k/a NMI, INC., WINDECO CORPORATION, TEXXON OIL CORP., AND INTERNATIONAL FINANCIAL SERVICES, INC. a/k/a IFS, INC. a/k/a IFS, INC. d/b/a IRM, INC.,<br><br>Relief Defendants. | **Civil Action No. 24-12602**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, United States Securities and Exchange Commission ("SEC" or "Commission") alleges as follows against Defendant Norman V. Meier ("Meier") and Relief Defendants Treuhand, Inc. ("Treuhand"), Norman Meier International, Inc. a/k/a NMI, Inc. ("NMI"), Windeco Corporation ("Windeco"), Texxon Oil Corp. ("Texxon"), and International Financial Services, Inc. a/k/a IFS, Inc. a/k/a IFS, Inc. d/b/a IRM, Inc. ("IFS").

## SUMMARY

1.     Massachusetts resident Norman Meier orchestrated a years-long international securities fraud.  From at least June 2015 to December 2023, Meier defrauded over 180 investors, mostly European, out of at least $7.9 million.  Meier engaged teams of cold callers in Eastern Europe who used fake names to sell fake investments.  Meier's scheme involved

soliciting investments in companies that he created for purposes of defrauding investors. Meier's scheme also involved soliciting investments in well-known public companies to which Meier and his teams of cold callers had no real connection.

2.      Meier's victims wired funds to bank accounts in the United States that Meier controlled. Rather than investing funds as promised, Meier misappropriated the money for his own use and to pay his overseas sales network to lure additional investors. Meier and his sales teams deceived investors into believing that the investors' money was being sent to a financial institution in the United States for investment in the United States. Many of Meier's victims were German speaking. Meier named one of his companies "Treuhand," a German word akin to "trust" or "escrow," such that investors believed they were sending funds to a trust or escrow account. In reality, the Treuhand bank account was one of several that Meier used to steal investor money and pay his sales network.

3.      Meier also defrauded investors in the United States. In 2015, Meier solicited investments from an individual in California while Meier was living in California. Meier convinced the California investor to invest in three entities, including relief defendant Windeco. The California investor wired a total of $12,500 to an account that Meier controlled. Meier failed to invest the money as he had promised, and instead misappropriated the investor's money for his own purposes. Meier solicited investments from two other investors in California, also in or around 2015.

## VIOLATIONS

4.      By virtue of the conduct alleged herein, Meier violated Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1), (2), and (3)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. §§240.10b-5(a), (b), and

(c)].

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

5.      The Commission brings this action pursuant to the authority conferred upon it by

Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d)(1) of the Exchange Act

[15 U.S.C. §78u(d)(1)].

6.      The Commission seeks a final judgment: (a) permanently enjoining Meier from

violating the federal securities laws by engaging in transactions, acts, practices, and courses of

business of the type alleged in this Complaint; (b) permanently enjoining Meier from, directly or

indirectly, including but not limited to, through any entity owned or controlled by him,

participating in the issuance, purchase, offer, or sale of any security, provided, however, that

such injunction shall not prevent him from purchasing or selling securities for his own personal

account; (c) barring Meier from acting as an officer or director of any public company, pursuant

to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange

Act [15 U.S.C. § 78u(d)(2)]; (d) ordering Meier to disgorge any ill-gotten gains with

prejudgment interest thereon, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15

U.S.C. §78u(d)(5) and (7)]; (e) ordering Treuhand, NMI, Windeco, Texxon, and IFS to disgorge

all unjust enrichment and/or ill-gotten gains, with prejudgment interest thereon; (f) ordering

Meier to pay a civil money penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C.

§77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; and (g) ordering such

other and further relief the Court may deem just and proper.

## DEFENDANT

7.      **Norman V. Meier ("Meier")**, age 49, is a resident of Wakefield, Massachusetts.

Meier has held a U.S. passport since at least December 2014.  Meier is a native of Switzerland.

His first language is Swiss German (dialect of the German-speaking area of Switzerland).  Meier

is the sole executive officer of relief defendants Treuhand, Inc. and Norman Meier International, Inc. (also known as NMI, Inc.).

## RELIEF DEFENDANTS

8.      **Treuhand, Inc. ("Treuhand")** incorporated in Massachusetts in December 2020, listing Meier as an officer, and purports to have a principal place of business in Boston, Massachusetts.  Treuhand has maintained bank accounts in the United States, including accounts opened in Massachusetts.  Meier is the sole signatory on Treuhand's bank accounts.

9.      **Norman Meier International, Inc., a/k/a NMI, Inc. ("NMI")** incorporated in Massachusetts in June 2022, listing Meier as an officer, and purports to have a principal place of business in Saugus, Massachusetts.  Meier is the sole signatory to one or more NMI bank accounts.

10.      **Windeco Corporation ("Windeco")** incorporated in Nevada in 2013 and purports to have a principal place of business in Las Vegas, Nevada.  Windeco has maintained bank accounts in the United States.  Meier is the sole signatory to one or more Windeco bank accounts.

11.       **Texxon Oil Corp. ("Texxon")** incorporated in Nevada in August 2014 and purports to have a principal place of business in Dallas, Texas.  Texxon has maintained bank accounts in the United States.  On four occasions between August 2014 and January 2018, an associate of Meier filed with the Commission Form D Notices of Exempt Offering of Securities for Texxon pursuant to Rule 506(b) of Regulation D under Section 4(a)(2) of the Securities Act. Meier is the sole signatory to one or more Texxon bank accounts.

12.      **International Financial Services ("IFS")** is an unincorporated entity and purported financial services firm located in New York, New York.  Meier created and maintained websites using a variation of "IFS," including "ifs-global.com," to deceive investors

into believing that they were dealing with a legitimate Wall Street firm.  In March of 2022, Germany's Federal Financial Supervisory Authority (BaFin) issued a notice ordering IFS to cease initiating unsolicited contact with former customers of a German based advisory firm.  IFS has maintained at least one bank account in the United States.  Meier is the sole signatory to one or more IFS bank accounts.  IFS and International Financial Services were names Meier ascribed to his private equity selling network.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to Sections 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§77t(d)(1) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa].  Venue lies in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].  A substantial portion of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the District of Massachusetts.  Meier resides in this district and controlled one or more bank accounts in this district where he received proceeds from his scheme.  Meier used Treuhand and NMI, both businesses that he incorporated in Massachusetts, to further his fraud.

14.     In connection with the transactions, acts, practices, and courses of business alleged in this Complaint, Defendant, directly or indirectly, singly or in concert with others, made use of the means or instrumentalities of transportation or communication in interstate commerce, or the mails.

**DEFENDANT'S ACTS IN VIOLATION OF THE FEDERAL SECURITIES LAWS**

**Meier's Method of Investor Solicitation**

15.     In 2014, Meier published a book titled *Create Wealth with Private Equity and Public Companies – A Guide for Entrepreneurs and Investors*.  Meier wrote of his dream "to become a millionaire no matter what it took."

16.     Meier maintained among his corporate records various lists of his goals for the years 2020 through 2023, which included to become a millionaire and to have "several homes and real estate all over the world."  In 2020, Meier aimed to create income streams from a "Private Equity Organization" in Europe and to have $100,000 in monthly income from his "Private Equity Business."  Meier also listed a goal to be CEO of a public company.

17.     Meier maintained a website called normanmeier.com.  On his website, Meier described himself as being born and raised in Switzerland.  He claimed to have advanced degrees from a university in Switzerland.  Meier claimed that he had been CEO of a publicly listed company.  Meier described himself in a 2013 blog posting as having a huge client base in Europe and North America and "a network all over the world."

18.     On his website, Meier described himself as an expert in raising investor funds through private equity, which Meier described as raising money from investors in companies not yet listed on a stock exchange.  Through normanmeier.com, Meier offered a training course called "Private Equity Broker Training" for individuals to learn how to secure investors for private equity investments.  Meier offered a "job opportunity" that first required "learn[ing] the basics and go[ing] through our training program."  In the program, a "trainee" would be expected to "make phone calls to potential investors," "generate at least 5 new leads per day," and "learn how to close a deal on the phone."  After completing the training, "the trainee will receive a

permanent job as a Private Equity Broker and will raise money every month for the sales

organization while earning commissions."

19.     Meier's book *Create Wealth* includes a how-to guide for soliciting investors

through cold calling.  Meier gives suggestions on "general statements that help to convince

investors", including:

- "If this train leaves, it is hard to get back on later.  And there is not another one coming that is going where you want to go."

- "If you sleep on it, you won't be smarter tomorrow.  If you knew what I know about his deal, you wouldn't hesitate one second."

- "How much time do you need to think about it?  2 weeks?  So are you going to think about it for 2 hours for the next 14 days? So a total of 28 hours?  I don't think so. That would be ridiculous, right?  So how much real thinking time do you really need?  One hour?  So let me help you right now.  If you still need time, then I will call you tomorrow morning?"

- "I am sorry if I am putting too much pressure on you right now. But you need to understand that you can buy a car and wait a couple of weeks before you actually get it.  But when it comes to stocks, one day or even one hour can make a difference whether you make 100% return or only 1%.  That's why I urge you to act now."

20.     In *Create Wealth*, Meier described a hypothetical sales pitch for a cold call to a

potential investor:

> *Hi, I am calling from XYZ Company.  We would like to introduce ourselves and our company to you.  We are a company specializing in ABC investments and we help companies go public.  We would like to send you some general information about our company by email so that you can see whether his could be of interest to you or not. We are currently working on deal ABC that will go public in 6 months and it is a very interesting investment opportunity because we can currently offer the shares at $0.50 and we expect the company to be value at $2.00 when it is listed . . . .*

21.     Meier writes in his book that he was a stockbroker "in Europe and North America" and that he "can teach you everything about getting international investors and how to approach different markets."  Meier's book provides guidance on how to structure a sales team to solicit investors by phone.  Meier describes paying salespeople an hourly wage and a commission for cold calling and securing investors.

22.     In describing the creation of a sales team, Meier writes in *Create Wealth*:

> Based on the clients that you will target you could set up a call center in a foreign country.  At one point we have only targeted investors in the German speaking part of Europe (Germany, Austria, and Switzerland) because the financial potential was much better at the time than in America.

> In Europe, a lot of people speak several languages.  We have had a marketing team of women who call up clients in Germany from an Eastern European country because the costs of running an operation in those countries are much cheaper.

**Meier's Commission Filings for Private Securities Offerings**

23.     Under Section 5 of the Securities Act, a company may not offer or sell securities unless the offering has been registered with the Commission or an exemption from registration is available.  Offerings that are exempted by Section 4(a)(2) of the Securities Act or its safe harbor under the Commission rule "Regulation D" are referred to as private placements.  Companies issuing securities in reliance on a Regulation D exemption are required to file with the Commission a document called a Form D, which is available online to the public and contains brief information about the company, its management and promoters, and the offering of securities.

24.     Meier signed a December 14, 2020 Form D filing with the Commission concerning a private placement offering of securities of Discovery Gold, Inc. ("Discovery

Gold"). Meier is identified in the Form D as a director of Discovery Gold. Discovery Gold purported to be a Wyoming corporation with a principal place of business in New York, NY.

25.     Meier signed a July 21, 2021 Form D filing with the Commission concerning a private placement offering of securities of New Energy Systems, Inc. ("New Energy Systems"). Meier is identified in the Form D as a director of New Energy Systems. New Energy Systems purported to be a Wyoming corporation with a principal place of business in New York, NY.

**Overview of Meier's Scheme**

26.     Meier began misappropriating money from investors as early as 2015. In 2015, a California resident met Meier while Meier was living in Carlsbad, California. Meier convinced the California resident to invest in three entities, including Windeco. The California resident sent two wires for purposes of investment, totaling $12,500, to an account that Meier controlled. Meier, however, failed to invest the money as he had promised and instead misappropriated the investor's money for his own personal purposes. Meier solicited investments from two other investors in California, also in or around 2015. Meier solicited the two additional California investors to invest in Windeco and Texxon. None of the California investors have received any proceeds from their purported investments.

27.     Between January 2017 and December 2023, U.S. bank accounts controlled by Meier received approximately $7.9 million in proceeds from individuals in Europe. The bank accounts received the proceeds by wire and the wire instructions often specified the investment purpose. For instance, $301,748 arrived with wire instructions including the German word "aktien" which translates to "stock" or "shares." Another $471,781 arrived with a notation for "Discovery" or "Discovery Gold." A total of $247,767 arrived with a notation for "New Energy Systems." A total of $523,572 arrived with a notation for "Barrick" or "Barrick Gold," which is a reference to a publicly traded mining company based in Canada. Of the $7.9 million, Treuhand

received $5,689,603, Windeco received $582,290, Texxon received $978,151, and IFS received $690,328.  The Investor Proceeds arrived from bank accounts in Germany, Austria, and Switzerland.

28.     Meier did not direct the Investor Proceeds to investment purposes.  Instead, he absconded with the investor proceeds for his own personal purposes including payments to further his scheme.  Meier's use of investor proceeds for his own purposes involved transferring investor proceeds to his personal bank accounts or to NMI bank accounts, including accounts in the United States.

29.     Among Meier's diversion of Investor Proceeds, Meier wired portions of the proceeds to other individuals in Serbia and other overseas locations, who were not investors.  Those overseas payments were commissions or finder's fees for securing victims of Meier's investment scheme.

30.     Meier maintained a list of members of his "private equity teams and people" which included individuals who received payments from accounts controlled by Meier.

31.     Meier also maintained written goals for IFS, or "International Financial Services," which was the name that Meier ascribed to his private equity selling network.  Meier's business goals for "IFS/Private Equity" in 2020 included "Build a system to generate daily leads of potential investors."  His goals for 2022 included "IFS Private Equity Europe (Serbia)."  His goals for 2023 included an "IFS USA: Hire people and start operations."

32.     In March 2020, Meier received an email from an individual representing a call center in Ukraine.  Meier spoke with the Ukrainian call center representative and then sent an email to her saying "I am very interested in working with you."  He wrote that "we are mainly dealing with German speaking clients.  Therefore, it would make most sense to start with a small team of about 5 people who speak German very well and ideally without an accent."

33.      Meier continued in his email to the Ukrainian call center representative:

The first call to a potential investor is a cold call.  A marketing person calls up people in Germany and asks them if they are interested in receiving our info material by email.  This potential investor should be open and willing to listen and should have the ability to invest at least $10,000.

The second call, which is a follow up sales call, can be done by our sales team.  They will try to close the deal and get the person to invest into the shares that we offer.

We typically sell shares of new companies that are not yet listed on a stock exchange but plan to go public soon.

34.      Meier also wrote to the Ukrainian call center representative that he would send two projects to start: Windeco Gold Corporation and Global Energy Group, Inc.

35.      Meier maintained a to do list for May 2020 which included "3 Fake news websites", including "Global Energy."

36.      In October 2021, Meier wrote to a graphic designer in Argentina to request creation of IFS-branded factsheets "with a quick summary for each company and a STRONG BUY recommendation."  Meier requested factsheets for, among others, Discovery Gold and Global Energy Group.

37.      In his goals for 2022, Meier listed "peace of mind, legal businesses."  He also sought to "legally save."  For 2023, Meier included under the category of "Business changes" his goal of "only legal deals" and "IPO deal with real projects."

38.      Meier's goals for 2022 and 2023 also included to "move money to other country," and "move $100,000 to Switzerland for additional safety from government, etc."

39.      In October 2019, Meier wrote of a goal to have one office "with sales people where I work from every day," but perhaps with a different name than IFS "due to negative links, etc."

**Examples of the Scheme**

*Investor 1*

40.     An investor, referred to herein as "Investor 1" is a German citizen and resident of Germany.  Investor 1 is over 85 years old and is retired.  Investor 1 is a veteran of the German Air Force.

41.     In or about April 2023, Investor 1 was contacted by phone by a person identifying himself as Martin Richter.  Richter claimed to work for a company called International Portfolio Management in New York City.  In reality, "Martin Richter" was either Meier or someone acting at Meier's direction or in concert with him.

42.     Investor 1 found Richter to be very convincing and honest sounding.  Richter convinced Investor 1 to invest in a private offering of shares of Databricks, Inc.  Databricks is a Delaware corporation with a principal place of business in San Francisco, California.  Richter claimed that Databricks had an upcoming initial public offering and would be listed on the NASDAQ exchange in the United States before the end of 2023.

43.     Meier emailed himself a link to Databricks' website on February 24, 2023.

44.     On or about April 3, 2023, Individual 1 received an email from info@ipm-invest.com (the "IPM Email Address").  The email bore a signature block for Sabine Huber, Administration and Investor Relations, IPM – International Portfolio Management, One World Trade Center, 285 Fulton Street, Suite 2800, New York, NY 10007.

45.     The April 3, 2023 email from Huber to Investor 1 also listed IPM's website www.ipm-invest.com (the "IPM Website").  Meier was the registered owner of IPM's Website. The website was hosted by GoDaddy, Inc., but Meier registered his ownership through Domains by Proxy.  This provided a layer of anonymity because Domains by Proxy was listed as the contact for ownership of the website, rather than Meier.

46.     Huber's April 3, 2023 email told Investor 1 that he would "receive the Databricks documents from us."[1]  The email represented that Databricks was planning for an initial public offering (IPO) in the summer of 2023.  The email contained a written overview of Databricks, its history, its products and operations, and a planned initial public offering for 2023.

47.     On July 18, 2023, Meier received an email from an individual who attached a written description of Databricks substantively identical to the description in the April 3, 2023 email from IPM to Investor 1.  The individual asked if Meier could arrange for a graphic designer to create a Databricks brochure and "it would be useful to design editable brochures so that changes to them can be made right away."

48.     The IPM Email Address sent Investor 1 a Databricks "Share Subscription Agreement."  A subscription agreement is an agreement containing the terms of an investment in a private offering of securities.  Investor 1 completed the Share Subscription Agreement and returned it by email to IPM on April 28, 2023.

49.     The Share Subscription Agreement purported to concern a private placement of Databricks common stock with an offering commencing on August 1, 2020 and terminating on April 1, 2021.  Databricks did not make an offering with those dates.  The Subscription Agreement was a fake.

50.     The cover page of the Subscription Agreement contained logos for Databricks and IPM, which made it falsely appear that IPM was an underwriter or agent of Databricks for purposes of the offering.

51.     The Subscription Agreement was written in German.  It provided, among other things, that the "purchaser" (i.e., Investor 1) agreed to purchase Databricks shares at a specified

---

[1] This email and certain other communications and records cited herein were written in German and have been translated for purposes of this Complaint.

price and to deliver to Databricks' agents (i.e., IPM) a signed subscription agreement and an authorized U.S. Bank Check or wire transfer to a specified bank account. The specified bank account was a bank in Peabody, Massachusetts in the name of Treuhand. The Share Subscription Agreement provided that any disputes would be governed by U.S. law and that jurisdiction would be in California.

52.     The Subscription Agreement further provided that Databricks would notify the purchaser if it had accepted the purchaser's subscription, in which case it would deliver a share certificate. IPM then led Investor 1 to believe that he had in fact made an investment in Databricks and that his shares were being held in an IPM account in the United States.

53.     IPM also convinced Investor 1 to invest in the German issuer Rheinmetall AG. IPM told Investor 1 that there would be a tax advantage to purchasing the Rheinmetall shares in the United States rather than Germany. Investor 1 agreed to invest in Rheinmetall. At IPM's direction, Investor 1 also completed an IRS Form W-8BEN, Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding and Reporting. Form W-8BEN is a form for foreign persons who receive income from U.S. sources.

54.     On April 28, 2023, Investor 1 informed IPM that Investor 1 would invest in Databricks. On May 2, 2023, Investor 1 informed IPM that Investor 1 would invest in Rheinmettall, and Investor 1 placed an additional Rheinmettall order on May 11, 2023.

55.     On April 28, 2023, an IPM representative emailed Investor 1 login information for an investment account. The address for the purported online account was onlinedepot.systems. Meier was the registered owner of the onlinedepot.systems website. The website was hosted by GoDaddy, Inc., but Meier maintained anonymity by registering his ownership through Domains by Proxy.

14

56.     In Germany, "depot" is a term used to describe a brokerage account.  Meier maintained among his corporate files an Excel document titled "online depot systems."  That file identified an investor (different than Investor 1) with a purported holding of Databricks shares.  The file also identified several investors who sent money to Treuhand accounts controlled by Meier, as well as to Windeco.

57.     On May 3, 2023, Investor 1 wired $35,696 to a Treuhand account in the United States for which Meier is the sole signatory.  On May 25, 2023, Investor 1 wired an additional $112,375 to the Treuhand account.  Investor 1's wires were for purposes of investment in Databricks and Rheinmettall.

58.     Investor 1 understood Treuhand to be a German word akin to "escrow" in English.  He understood that he was wiring funds to some form of an escrow account for purposes of investment.  In reality, Treuhand was a corporation that Meier controlled and operated for the purpose of deceiving investors.

59.     In August 2023, Investor 1 was contacted by an individual identifying himself as Mr. Jung of IPM.  Jung stated that Richter was ill and that Jung would be taking over Investor 1's account.  In reality, "Jung" was either Meier or someone acting at Meier's direction or in concert with him.  Jung stated that IPM was being taken over by another company and that Investor 1 should relocate shares from IPM in the United States to an account in Germany.  Jung said, however, that this would require a transfer fee to cover IPM's commission and the U.S. tax on the gains in Rheinmettall shares.  At Jung's direction, Investor 1 sent the transfer fee to an account in Switzerland.

60.     Investor 1 has tried to reach the IPM representatives but at some point they disappeared.  They no longer replied to Investor 1's emails or phone calls, and the IPM website disappeared.

61.     Meier absconded with Investor 1's money after it arrived in Treuhand's account. None of Investor 1's money intended for investment in Databricks was invested in Databricks or in any other security.  None of Investor 1's money intended for investment in Rheinmettall was invested in Rheinmettal or any other security.

*Investor 2*

62.     An investor, referred to herein as "Investor 2" is a German citizen and resident of Germany.

63.     On February 24, 2022, the German carmaker Volkswagen AG announced a possible IPO of shares of its Porsche brand.  The IPO ultimately took place in September 2022 and Porsche shares became publicly traded on the Frankfurt Stock Exchange.

64.     In the summer of 2022, an individual identifying himself as Tobias Moser contacted Investor 2.  In reality, "Moser" was either Meier or someone acting at Meier's direction or in concert with him.  Moser introduced Investor 2 to an individual calling himself Steven Weiss.  Investor 2 understood Weiss to work on Wall Street in New York.  Weiss represented that he could sell Investor 2 shares of Porsche which would become more valuable following its upcoming IPO.  Investor 2 transferred $500,000 to the United States to invest in Porsche shares.  After Porsche went public, Investor 2 was unable to contact Moser or Weiss.

65.     In March or April of 2023, Moser contacted Investor 2 and said he was now working for IPM.  Moser told Investor 2 that Weiss had committed fraud but that IPM could recover the $500,000 Porsche investment.  Moser told Investor 2 that Investor 2 would have to convert the Porsche stock into Rheinmettall stock.  Moser told Investor 2 that this would require a transfer fee of $120,000.

66.     Investor 2 understood that the Porsche shares had been purchased in the United States, and that the conversion of shares into Rheinmettall shares and payment of a transfer fee

would be required for the return of Investor 2's money.  On June 15, 2023, "Sabine Huber" of IPM emailed the U.S. tax form W-8BEN to Investor 2 in connection with the purported trade of Porsche shares for Rheinmettall shares.

67.     Investor 2 also received emails from purported IPM representatives, which included information indicating that IPM was located at One World Trade Center in New York and listing the ipm-invest.com website owned by Meier.

68.     As directed by IPM, Investor 2 directed the purported transfer fee to three different banks.  One portion went to a Treuhand account in the United States controlled by Meier.  A second portion went to a different account in the United States.  A third portion went to one or more accounts in Europe.

69.     After sending payment for the purported transfer fee, Investor 2 communicated with IPM regarding delays in receiving the return of her investment proceeds.  IPM stopped communicating altogether in November 2023.

*Investor 3*

70.     On March 20, 2023, a Treuhand account located in the United States and controlled by Meier received $109,223 by wire from an individual ("Investor 3") in Switzerland. The wire instructions identified the purpose of the wire as relating to shares of Barrick Gold Corporation.  Barrick Gold is a company with shares of stock publicly traded on the New York Stock Exchange.

71.     After arriving in Treuhand's account, no portion of Investor 3's funds were used to purchase Barrick Gold shares.  Three days after the receipt of Investor 3's funds, Meier wrote a check from the Treuhand account to his own personal account for $25,000.  On March 27, 2023, Meier wrote a check from his personal account for a $7,585 payment related to installation

of an in-ground pool at Meier's home in Massachusetts. Meier's written goals for 2022 included "get a pool for $80,000."

*Investor 4*

72.     On September 8, 2022, a Treuhand account in the United States and controlled by Meier received a wire of $33,972 from an individual in Switzerland ("Investor 4"). The purpose of the wire was designated as an investment in Discovery Gold, one of the companies for which Meier signed a Form D related to a private offering. No portion of Investor 4's proceeds were invested in Discovery Gold shares or any other security. Also on September 8, 2022, Meier transferred $16,500 to a bank account in his name.

73.     On September 27, 2022, Investor 4 wired $76,577.26 to the Treuhand account for the purpose of investment in New Energy Systems, another of the companies for which Meier signed a Form D related to a private offering. No portion of Investor 4's proceeds were invested in New Energy Systems or any other security.

*Investor 5*

74.     Investor 5 is over 65 years old and a resident of Germany. In 2019, Investor 5 was solicited to invest in a company called Canadian Minerals or Canadian Mineral Research ("Canadian Minerals"). Investor 5 understood the Canadian Minerals investment to be high-risk and that it might not ever generate returns. Then, in 2021, Investor 5 was contacted by an organization called Global Financial Services and told that Canadian Minerals was being acquired by Barrick Gold and that Investor 5 could obtain Barrick Gold shares, and that Investor 5 should buy more shares of Canadian Minerals. Investor 5 was persuaded by the Global Financial Services representatives and bought more Canadian Minerals shares. One caller from Global Financial Services identified himself as Antonio Schwarz.

75.     Barrick Gold has maintained on its website a public warning of investment schemes involving purported exchange offers with Canadian Minerals.  According to Barrick Gold's website:

> The individuals behind these schemes use various tactics and techniques in an attempt to persuade potential investors that the investment opportunities are legitimate. These include using falsified documents (such as certificates and agreements) bearing Barrick's logo or marks, impersonation of and falsified signatures from Barrick executives, creating websites that contain content taken from Barrick's website and may even have URLs that contain Barrick's name, purporting to use email addresses with the barrick.com domain, and representing falsely that they are acting on behalf of Barrick.

76.     Investor 5 received a letter on Barrick Gold letterhead, dated April 18, 2022 and purportedly signed by Barrick Gold corporate officers, to "shareholders of Canadian Minerals, Inc." purporting to "confirm that Mr. Antonio Schwarz oversees the transaction between Barrick Gold and Canadian Minerals for the planned take-over."

77.      Meier maintained an exact copy of the fake April 18, 2022 Barrick Gold letter in his corporate files.

78.     Meier also maintained copies of an email to investors with the subject line "Canadian Mineral Resources Inc. – Info."  The email was signed by "Antonio Schwarz, Private Equity Specialist."  Meier also emailed in March 2023 with the Argentina-based graphic designer about creating "share exchange contracts" for "Canadian Minerals to receiving Barrick G."

79.     Investor 5 was ultimately convinced to send money to Treuhand accounts in the United States for purported investments in Barrick Gold, Amazon, Porsche, and Tik Tok. Investor 5 has lost over $300,000 to the scam.  Investor 5 also completed a U.S. tax form W-8BEN in connection with the purported investments.

80.     Investor 5 received one or more emails purporting to be from Euro Finance Group in New York, NY.  The emails contained a signature block including the website eurofinglobal.com.

81.     Investor 5 received one or more emails purporting to be from Antonio Schwarz of Global Financial Services.  The emails contained a signature block including the website www.gfs-invest.com.

82.     At least one investor (different than Investor 5) received a copy of a passport purporting to be identification for Antonio Schwarz.  Meier maintained in his records a copy of the same passport, identical in all respects except for a different first name.

83.     Investor 5 also received from Global Financial Services access to a purported online account system called "E-Account Systems" at e-account.systems.com.  Investor 5's purported online account purported to show holdings in Barrick Gold and other securities.  The purported online account statement included contact information for Global Financial Services and "EuroFinance" in New York, NY.  EuroFinance purported to have an email address info@ifs-global.com.

84.     Meier was the registered owner of the websites gfs-invest.com, e-account.systems.com, ifs-global.com, and eurofinglobal.com.

**FIRST CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**Violations of Section 17(a) of the Securities Act [15 U.S.C. 77q(a)]**
**(As to Defendant Meier)**

85.     The Commission realleges and incorporates by reference paragraphs 1 through 84 as if fully set forth herein.

86.     By engaging in the acts and conduct alleged above, Meier directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or

communication in interstate commerce or by use of the mails: (1) employed devices, schemes, or artifices to defraud; (2) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and (3) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers, in violation of Sections 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2), and (3)].

### SECOND CLAIM FOR RELIEF
### <u>FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES</u>
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**[15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5]**
**(As to Defendant Meier)**

87.     The Commission realleges and incorporates by reference paragraphs 1 through 84 as if fully set forth herein.

88.     By engaging in the acts and conduct alleged above, Meier, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange: (1) employed devices, schemes, or artifices to defraud; (2) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchases and sellers of securities, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and subsections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

### THIRD CLAIM FOR RELIEF
**Other Equitable Relief, Including Unjust Enrichment and Constructive Trust**
**(As to Relief Defendants)**

89.     The Commission realleges and incorporates by reference paragraphs 1 through 84 as if fully set forth herein.

90.     Section 21(d)(5) of the Exchange Act states, "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

91.     Relief Defendants received ill-gotten funds provided by investors for purposes of investment.  Relief Defendants have no legitimate claim to this property.  In equity and good conscience, Relief Defendants should not be allowed to retain such funds.

92.     As a result, Relief Defendants are liable for unjust enrichment and should each be required to return their share of ill-gotten gains, in an amount to be determined by the Court. The Court should also impose a constructive trust on the ill-gotten gains in the possession of Relief Defendants.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

A.     Enter a Final Judgment permanently restraining and enjoining Meier, as well as his agents, servants, employees, attorneys, and other persons in active concert or participation with them, from directly or indirectly engaging in the conduct described above, or in conduct of similar purpose and effect, in violation of:

       1.      Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and

       2.      Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

B.      Enter a Final Judgment permanently restraining and enjoining Meier from, directly or indirectly, including but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account.

C.      Enter a Final Judgment barring Meier from acting as an officer or director of any public company, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

D.      Enter a Final Judgment ordering Defendant Meier to disgorge his ill-gotten gains or unjust enrichment, with prejudgment interest thereon, to effect the remedial purposes of the federal securities laws.

E.      Enter a Final Judgment against Relief Defendants ordering each of them to disgorge all unjust enrichment and/or ill-gotten gains, with prejudgment interest thereon, to effect the remedial purposes of the federal securities laws.

F.      Enter a Final Judgment ordering Meier to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

G.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered.

H.      Grant such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands a jury trial in this action of all issues so triable under the claims in this Complaint.

Dated: October 11, 2024                    Respectfully submitted,

/s *Michael C. Moran*
Michael C. Moran (Mass. Bar No. 666885)
Kerry Dakin (Mass. Bar No. 640826)
William J. Donahue (Mass. Bar No. 631229)
Colin D. Forbes (N.Y. Bar No. 4664264)
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA  02110
Phone:          (617) 573-8900
Facsimile:      (617) 573-4590
Moran email:  MoranMi@sec.gov
Moran phone: (617) 573-8931

*Counsel for Plaintiff Securities and Exchange Commission*